**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | |
|---|---|
| **RUBY MCMULLEN,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**TUSKEGEE UNIVERSITY,**<br><br>**Defendant.** | **CIVIL ACTION NO.: 3:15-CV-16-WHA** |

# DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT


Lisa Karen Atkins
Katherine E. Reeves
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
420 North 20th Street, Suite 1900
Birmingham, Alabama 35203
Telephone: (205) 328-1900
lisa.atkins@ogletreedeakins.com
katherine.reeves@ogletreedeakins.com

Attorneys for Defendant
Tuskegee University

# TABLE OF CONTENTS

I. **INTRODUCTION** .......... 1

II. **NARRATIVE STATEMENT OF UNDISPUTED FACTS** .......... 3

A. McMullen's Employment with Tuskegee .......... 3

B. McMullen's disclosure of confidential information and resulting termination .......... 4

C. The Terminations of Boleware, Judkins and Woodard .......... 14
1. Tracy Boleware — December 2, 2013 .......... 14
2. Fred Judkins — January 15, 2014 .......... 18
3. Kimberly Woodard — January 31, 2014 .......... 20

D. Tuskegee Staff Handbook designates employees as at-will .......... 20

III. **LEGAL ARGUMENT** .......... 22

A. Summary judgment standard .......... 22

B. McMullen's Title VII retaliation claims fail as a matter of law .......... 23
1. McMullen cannot establish a *prima facie* case of retaliation .......... 23
a. McMullen did not engage in protected activity .......... 24
i. Under the manager's rule, McMullen did not engage in protected activity .......... 24
ii. McMullen's Professional Opinion regarding an Employee on FMLA Leave is not protected activity under Title VII .......... 30
iii. McMullen did not engage in protected activity with regard to Woodard's termination and McMullen's claim related to Woodward exceeds the scope of her EEOC charge .......... 30
b. McMullen cannot establish but-for causation .......... 32
2. McMullen cannot refute Tuskegee's legitimate, non-retaliatory reason for her discharge .......... 36

C. McMullen's claim for breach of implied contract fails as a matter of law because her employment was at-will .......... 38

IV. **CONCLUSION** .......... 41

## I. INTRODUCTION

Plaintiff, Ruby McMullen ("McMullen"), filed the instant suit on January 8, 2015, asserting claims against Defendant, Tuskegee University ("Tuskegee" or "the University"), for retaliation under Title VII of the Civil Rights Act of 1964, *as amended* ("Title VII"), breach of implied contract under Alabama state law. (Doc. 1).[1] McMullen contends that she was terminated from her position as Human Resources ("HR") Director by Tuskegee's former interim President, Dr. Matthew Jenkins ("President Jenkins"), in retaliation for "complaining about discriminatory practices." (Doc. 1, ¶ 1). Specifically, McMullen's complaint contends that she opposed the termination of unidentified University employees. (Doc. 1, ¶¶ 13, 15-16, 20-21). Although she did not identify the employees in her complaint, during her deposition, she identified them as Tracy Boleware, Fred Judkins, and Kimberly Woodard. (Ex. A, McMullen Depo., p. 225:21-227:5, 316:5-10). As set forth more fully below, McMullen's retaliation claims fail because McMullen did not engage in protected activity when she advised the University that the termination decisions might appear retaliatory, a duty that she admits fell within her assigned responsibilities as HR Director. (Ex. A, McMullen Depo., p. 224:20-225:6, 225:22-226:10, 310:3-8). In addition, the undisputed facts show that President Jenkins terminated McMullen because he lost confidence in her ability to serve as HR

[1] References to pleadings will be denoted by the word "Doc."

Director and believed she was leaking confidential personnel information. (Ex. B, Jenkins Depo, p. 59:2-60; Ex. N, Termination letter). McMullen cannot establish that her alleged opposition to these terminations was the "but for" cause of her termination. Nor can McMullen establish evidence of pretext to refute President Jenkins' legitimate, non-retaliatory reason for termination. As such, her retaliation claims fail and are due to be dismissed.

McMullen also asserts a state law claim for "breach of implied contract of employment," in which she contends that the University's Staff Handbook created a contract that entitled her to have the opportunity to respond to and appeal her termination. (Doc. 1, ¶¶ 1, 23-25, 34-35). However, the Handbook explicitly states that McMullen's employment was "at-will" and begins with a passage reading, "This Staff Handbook . . . is not to be interpreted as a legal document or employment contract." (Ex. C, Staff Handbook, at Bates # 0045). Under Alabama precedent, McMullen's employment was clearly at-will and the Handbook was not an implied contract. Finally, McMullen never attempted to appeal or challenge the termination decision via the process set out in the Handbook. (Ex. A, McMullen Depo., p. 431:20–432:23). As such, her failure to receive an appeal or an opportunity to challenge her termination is not a breach of the Handbook or the result of any wrongful act on the part of the University.  For these reasons, McMullen's breach of implied contract claim fails and is due to be dismissed.

## II. NARRATIVE STATEMENT OF FACTS[2]

### A. McMullen's employment with Tuskegee.

McMullen was employed by Tuskegee as Director of Human Resources from December 1, 2012 to January 21, 2014. (Ex. D, Tuskegee Offer Letter; *see also* Ex. A, McMullen Depo., p. 20:3-9; 258:18-21). At the time of hire, McMullen reported directly to former President Gilbert Rochon.[3] (Ex. A, McMullen Depo., p. 443:2-17). McMullen reported directly to the President during most of her employment, except for a brief period (in early December 2013) when she reported to the University's General Counsel. (Ex. A, McMullen Depo., p. 31:12-23, 359:2-22). On October 19, 2014, Dr. Matthew Jenkins became interim President, and he served in that position until June of 2016. (Ex. B, Jenkins Depo, p. 15:15-23,). As HR Director, McMullen was "responsible for employment, recruitment, benefits administration, and performance management." (Ex. A, McMullen Depo., p. 41:4-11). It was her responsibility to maintain the confidentiality of all personnel records, personnel-related correspondence, and issues residing in the Department. (Ex. A, McMullen Depo., p. 105:13-106:8, 117:2-23). McMullen was also a member of the President's Cabinet and gave advice and guidance to the President. (Ex. A, McMullen Depo., p. 26:22-27:1, 31:12-20).

---

[2] For purposes of this motion and supporting brief only, Defendant presents the facts viewed in the light most favorable to Plaintiff as required under Fed. R. Civ. P. 56.

[3] Dr. Rochon served as University President from November 1, 2010 to October 19, 2013. (Ex. A, McMullen Depo., p. 206: 1-4).

## B. McMullen's disclosure of confidential information and resulting termination.

President Jenkins' cabinet members reported directly to him, and he reported directly to the Board of Trustees. (Ex. B, Jenkins Depo., p. 16:5-12). President Jenkins understood that it was his responsibility to administrate and manage the affairs of the University and, in his view, he was responsible for maintaining the integrity of the University. (*See* Ex. B, Jenkins Depo., p. 16:16-20, 25:13-14). According to President Jenkins, "I'm a person that trust means everything to me. And the people I accumulate in all my businesses - - that's very important." (Ex. B, Jenkins Depo., p. 85:9-12).

When she was hired, McMullen signed a Tuskegee University Memorandum of Understanding ("MOU") titled "Confidentiality of Records and University Information," stating that she understood that "the unauthorized release or removal of confidential records or University information is strictly prohibited and may result in disciplinary action, up to and including dismissal from my position on the first offense." (Ex. E, MOU dated December 4, 2012; Ex. A, McMullen Depo., p. 21:4-22:6). The MOU also specified that if McMullen was in doubt about a request for information she should discuss the request with her manager (*i.e.*, the President). (Ex. E, MOU, ¶ 3). McMullen read and understood the MOU and knew that unauthorized of information disclosure could result in her immediate termination. (Ex. A, McMullen Depo., p. 21:20-22:22, 23:11-18). McMullen signed a second

Confidentiality Agreement agreeing to refrain from using, removing, disclosing, copying, and releasing confidential information, except as authorized in the scope of her duties. (Ex. F, Confidentiality Agreement;[4] Ex. A, McMullen Depo., pp. 24:2-9, 34:4-16). According to McMullen, she had a duty to "safeguard and retain the confidentiality of all confidential information." (Ex. A, McMullen Depo., p. 34:17-23). The Agreement stated that McMullen would be held accountable for any misuse or unauthorized disclosure of confidential information and that violation would result in discipline, including discharge. (Ex. F, Confidentiality Agreement; Ex. A, McMullen Depo., p. 40:14-17). In addition to these confidentiality agreements signed by McMullen, the Tuskegee Staff Handbook specifically identifies the following as grounds for "immediate dismissal of an employee: Breach of trust or dishonesty . . . Willful violation of an establish policy or rule . . . Unauthorized possession, use, or copying of any records that are the property of Tuskegee University. . . ." (Ex. C, Staff Handbook, p. E;[5] McMullen Depo., pp. 53:7-54:2).

Shortly after his appointment as interim President, Dr. Jenkins called McMullen in to discuss the fact that confidential personnel-related information leaking from the Human Resources Department. (Ex. B, Jenkins Depo., p. 53:11-19). He warned McMullen that this would not be tolerated (Ex. B, Jenkins Depo.,

[4] Ex. 2 to McMullen Depo.
[5] Ex. 5 to McMullen Depo.

62:19-21), that she was responsible for the information coming out of the HR Department, (Ex. B, Jenkins Depo., 52:11-23), and he told her he felt she was personally responsible for the leaks. (Ex. A, McMullen Depo., pp. 291:22-292:8, 293:5-21). President Jenkins also became aware that McMullen was "involved with a Board member," and he initiated an Anti-Fraternization Policy,[6] in response. (Ex. G, Anti-fraternization Policy; Ex. B, Jenkins Depo., p. 74:2-14; Ex. Z, Webb Depo., p. 78:15-23).[7] President Jenkins notified the Chairman of the University's Board of Trustees, Major General Charles Williams (Ret.), that he was concerned about a relationship between McMullen and one of the Board members who he felt was trying to "run a satellite operation, administrative operation via Ms. McMullen" (Ex.. B, Jenkins Depo., p. 55:24-56:21, 61:1-3, 92:19-25) and undermining him as President. President Jenkins believed McMullen was "constantly communicating with some of the board members." (*Id*.). In response, on January 3, 2014, General Williams sent an email to President Jenkins and copied the Board member suspect by President Jenkins to be – with McMullen's assistance – working against him, and copying the Board member, Shamima Amin

[6] McMullen acknowledged implementation of this new policy. (Ex. A., McMullen Depo., p. 101:16-17).

[7] McMullen alleges that she communicated with the Board member because he was on the human resources committee. (Ex. A, McMullen Depo., p. 157:16-18). However, while Webb served as Personnel Director for Tuskegee, she never gave the Board member access to confidential personnel information, despite his attempts to obtain the same. (Ex. Z, Webb Depo, pp. 89:24-90:10). Webb also testified that providing the Board member with specific information about a job applicant during the application process would be a breach of confidentiality and that if McMullen did the same it would be a breach. (Ex. Z, Webb Depo., p. 91:4-12).

(Chief of Staff), and Verna Little (Executive Secretary to the Board of Trustees) stating:

> The governance framework of our University [sic] has been in place for over a hundred years . . . . For clarification of the University staff providing information/responses to a request of the the [sic] board (incl any of its oversight committees) is very clear. As Acting President, you have the full authority of an appointed President and as a result, this Board expect and require [sic] you to approve **all** information/responses to any board (incl committee) request. The **University staff** works for you and the board **as a unit** approves/disapproves whatever you present for its consideration. The board oversight committees do not exercise any operations/administrative authority over the staff that works with them on committee work.
>
> This is a very delicate governing matter in an higher education enterprise that must be done right without exceptions. Please do not hesitate to get back to me if further clarification is necessary.

(Ex. H, January 3, 2014 email (emphasis in original); Ex. A, McMullen Depo., pp. 165:13-166:14).[8] The **only** Board Member copied on the Chairman's email was the one suspected of receiving information from McMullen. (*See* Ex. H; January 3, 2014 email; Ex. B, Jenkins Depo., p. 61:1-3). The President's office sent the Chairman's email to all members of the President's cabinet, including McMullen, with a note stating: "Please note that before you provide any information to the

[8] As Webb, a seasoned HR professional, explained: "There shouldn't be any conversations about personnel matters outside of anyone that's directly involved in that circle of confidence per the case. And particularly, it was my –it's always been my practice and the way I was taught, that that – that my communication about personnel matters should be directly with the CEO, in this case the president. And that in addition to that, that would – could present another problem for the institution with a governance issue because trustees can't have day-to-day interact – be involved in the day –to-day activities and practices and operation of the university." (Ex. Z, Webb Depo., p. 89:1-17).

Board or Board members, formally or informally, you need to submit the information to the President's Office for President's approval. He will forward the information to the Board if he thinks it is appropriate." (Ex. H, January 3, 2014 email).

In addition, President Jenkins believed the daily communications between McMullen and the Board member were disrupting the whole University. (Ex. B, Jenkins Depo., p. 93:11-15). Dr. Jenkins was not the first President to voice concern over McMullen's exchange of confidential information with the Board member: his predecessor, former President Gilbert Rochon addressed the same issue in the first few weeks of McMullen's employment. (Ex. A, McMullen Depo., p. 161:9-17). On December 14, 2012, McMullen had sent the Board member an email attaching a list of the salaries of the University's Vice Presidents. (Ex. I, December 14, 2012 email).[9] According to McMullen, President Rochon subsequently addressed the issue with her, and told McMullen to no longer give the Board members any information. (Ex. A, McMullen Depo., pp. 161:9-17, 164:10-12).

The communication between McMullen and the board member did not stop. In 2013, McMullen sent him an email from her Tuskegee account providing her personal email address ("twoshuz79@yahoo.com") as the subject matter line,

---

[9] Ex. 21 to McMullen Depo.

reading, “This is a test.” (Ex. J, October 14, 2013 email).[10] On March 2013, the Board member forwarded several resumes to McMullen from persons he wished to be candidates for the University’s vacant Athletics Director position, without requiring the candidates to go through an application process. (Collective Ex. K, March 28, 2013 emails;[11] Ex. A, McMullen Depo., p. 190:12-21). On November 7, 2013, McMullen sent the Board member an email, after 12 midnight, stating that she would call him later about a rumor. (Ex. L, November 7, 2013 email).[12]

On December 20, 2013, McMullen responded to an email from Vice President Mohammed Bhuiyan to Tuskegee’s Chief Information Officer, Fred Judkins, enclosing a written reprimand to Judkins. (Ex. M, December 20, 2013 email).[13] In her response, McMullen criticized Vice President Bhuiyan and the University Counsel for not allowing her to review the write-up before it was issued and *actually copied* the reprimanded employee, Judkins, on the communication. (Ex. M, December 20, 2013 email;[14] Ex. B, Jenkins Depo., p. 91:8-22;). President Jenkins was concerned by McMullen’s decision to copy Judkins, and it seemed to him to show that she was acting against the University’s interests. (*See* Ex. B, Jenkins Depo., p. 91:8-22). President Jenkins believed information regarding Judkins’ termination was leaked to Judkins prior to his termination, and when

[10] Ex. 24 to McMullen Depo.
[11] Exs. 26 and 27 to McMullen Depo.
[12] Ex. 25 to McMullen Depo.
[13] Ex. 50 to McMullen Depo.
[14] Ex. 30 to McMullen Depo.

President Jenkins went to confirm the source of the leak, he learned it was McMullen. (Ex. B, Jenkins Depo., p. 54:9-55:9).

On December 6, 2013, due to his concerns about McMullen, President Jenkins brought a seasoned HR veteran, Kathryn Webb, on board as an independent consultant. (Ex. Z. Webb Depo., pp. 16:24-17:16). He told Webb that this was because he could not trust McMullen to maintain the confidentiality of two investigations. (Ex. Z, Webb. Depo., pp. 45:14-23, 87:23-88:10). In fact, McMullen admitted in her deposition that she sent clearly confidential information outside of the institution to her personal email. (Ex. A, McMullen Depo., p. 278:6-11).

From the time she came on board in early December 2013, Webb recalls President Jenkins expressing concern that McMullen was breaching confidentiality both inside and outside the University. (Ex. Z, Webb Depo., p. 45:5-9). President Jenkins specifically told Webb he was concerned that McMullen was disclosing hiring and interview information about candidates and personnel actions to the Board member. (Ex. Z, Webb Depo., p. 40:13-20). During a meeting on December 19, 2013, Webb recalls President Jenkins stating to McMullen, "I have reasons not to trust you and to believe that you give out confidential information, and now here we are – with this situation – with this situation again." (Ex. Z, Webb Depo., p. 40; 7-12). After the December 19, 2013 meeting, President Jenkins continued to

express concern to Webb that McMullen was not maintaining confidentiality. (Ex. Z, Webb. Depo., p. 52:3-8). On January 6, 2014, Webb met with President Jenkins; he again stated that he was alarmed by the regular communication between McMullen and the Board member. (Ex. Z, Webb Depo., pp. 52:11-53:8). President Jenkins told Webb that he did not think McMullen could be a part of the core team he was building if she could not be trusted. (Ex. Z, Webb Depo., pp. 53:18-54:9). During a telephone call with Webb prior to McMullen's termination, President Jenkins, told Webb he did not trust McMullen and there was no point in her continuing to work for the University if she could not be trusted. (Ex. Z, Webb Depo., p. 59:4-8). Webb recalls that leading up to McMullen's termination, President Jenkins told Webb he was unhappy with how McMullen handled a complaint against one of her HR staff members (Claretta Moore) because McMullen did not take the complaint as seriously as he believed she should have. (Ex. Z, Webb Depo., pp. 59:9-16, 60:7-61:5). President Jenkins finally expressed to Webb that there were just too many incidents with McMullen for him to be able to trust her. (Ex. Z, Webb Depo., p. 60:1-6). Several days before McMullen's termination, President Jenkins informed Webb he was terminating McMullen because he could not trust her or see her as a member of his team to move the University forward. (Ex. Z, Webb Depo., pp. 64:18-65:14).

In light of these ongoing breaches and McMullen's prior warnings, President

Jenkins made the decision to terminate McMullen, effective January 21, 2014. (See Ex. N, Termination letter; Jenkins Depo., pp. 51:25-52:2). When asked about the catalyst to terminate McMullen, Jenkins testified:

> Well, we had a lot of privileged information that was leaking out of that office. And we called her in and I told her about it. And I told her – I said, "You know, this is a very sensitive position. And you can't – you can't – whatever happens in this office, you're the person that's responsible to make sure you keep it very private, because otherwise, you'll jeopardize the whole University with lawsuits."
>
> And so I told her that, you know, just to make sure that she and her staff did not divulge information out of that office to – to anybody except efficient channel. She said she understood and wouldn't have any problem with her.
>
> Well, it continued. So when I was convinced that it was still coming out of there, I called her in and told her we had to make a change. And after we made that change, it completely stopped. Never had any more problems at all with that private information being released. Not until I left. Nothing.
>
> So she was warned at least twice.[15] And we couldn't have that again. We could be sued.

(Ex. B, Jenkins Depo., pp. 52:9-53:6). He also explained that his termination decision had nothing to do with discrimination "or nothing." (Ex. B, Jenkins Depo., p. 69:15-23).

On January 21, 2014, President Jenkins and University Counsel met with McMullen to terminate her employment. (Ex. B, Jenkins Depo., p. 57:9-17).

[15] McMullen recalls President Jenkins discussing his concern that McMullen was leaking confidential information at least one time prior to termination. (Ex. A, McMullen Depo., p. 292:2-293:21).

President Jenkins informed McMullen that the University was "going to go in a different direction" and asked University Counsel and Ms. Webb "to meet with her and be fair to her and be fair to the [U]niversity." (Ex. B, Jenkins Depo., p. 57:23-58:4).[16] President Jenkins provided McMullen with a termination letter he approved stating, in part, "I have lost confidence in your ability to meet my expectations." (Ex. N, Termination letter;[17] Jenkins Depo., p. 59:21-60;). President Jenkins lost trust in McMullen primarily because he continued to get reports of information being leaked out of the HR office to unauthorized personnel. (Ex. B, Jenkins Depo., pp. 59:21-60:2). The disruption caused by McMullen's regular communications with Griffin was also a factor in the termination decision. (Ex. B, Jenkins Depo., p. 93:11-15).

McMullen did not appeal her discharge. (Ex. A, McMullen Depo., p. 432:10-16). She did file a charge of discrimination with the EEOC dated June 16, 2014, asserting that President Jenkins retaliated and discriminated against her by terminating her employment. (McMullen Depo., pp. 431:20-432:23; Ex. O, EEOC charge).[18] McMullen speculated that President Jenkins retaliated against her because she stated to Vice President Bhuiyan and University Counsel that Boleware's termination should be postponed because it might appear retaliatory, a

[16] McMullen did receive two weeks of additional pay following termination. (McMullen Depo., p. 433:14-20).
[17] Pl's Ex. 6 to Jenkins Depo.
[18] Ex. O, McMullen EEOC charge.

meeting to which President Jenkins was not privy. (Ex. A, McMullen Depo., pp. 260:5 - 261:14).[19] McMullen also thought President Jenkins might have terminated her because she responded to a question from University Counsel about an unnamed employee who had applied for FMLA leave: this was another conversation President Jenkins was not a party to. (Ex. A, McMullen Depo., p. 277:3-15). McMullen concedes that she does not know why President Jenkins terminated her employment. (Ex. A, McMullen Depo., p. 278:10-15). No one, including the President, ever told McMullen that she was being terminated based on having given advice related to any employee's terminations. (McMullen Depo., pp. 290:12-291:6).

**C. The Terminations of Boleware, Judkins, and Woodard.**

**1) Tracy Boleware – December 2, 2013.**

Tracy Boleware served as the University's Director of Marketing, Communications, and Public Relations, and reported directly to the President. (Ex. B, Jenkins Depo. p. 36:9-12; Ex. A, McMullen Depo., p. 215:11-21; Ex. P, Boleware Position Statement). President Jenkins terminated Boleware on December 2, 2013, for poor performance and lack of credentials. (Ex. B, Jenkins Depo., p.40:18-41; Ex. A, McMullen Depo., pp. 219:1-220:4).[20] Specifically, she

---

[19] The Charge referenced only Boleware and Judkins, not Woodard. (Ex. A, McMullen Depo., pp. 281:1-282:4, 506:19-21).

[20] McMullen testified that Dr. Jenkins told her that he wanted to terminate Boleware because she "could not write." (Ex. A, McMullen Depo., pp. 253:9-254:2).

was fired due to her inability to deliver quality written work product and her lack of an undergraduate degree when the job require a master's degree as a minimum qualification. (Ex. B, Jenkins Depo., pp. 40:17-42:15, 46:6-14).

On the date set for Boleware's termination, but before the termination meeting took place, Boleware delivered a lengthy complaint of gender and race discrimination and harassment[21] to McMullen and University Counsel. (Ex. A, McMullen Depo., p. 223: 8-11). According to McMullen, she was handed the complaint after the decision had been made to fire Boleware. Ex. A, McMullen Depo., p. 242:9-243:3). Vice President Bhuiyan, according to McMullen, had decided to fire Boleware the week before the meeting. (Ex. A, McMullen Depo., p. 218:3-14). During the meeting, McMullen opined that terminating Boleware after McMullen's receipt of Boleware's complaint "gives the appearance of retaliation." Ex. A, McMullen Depo., p. 224:16-23). McMullen recommended that they postpone the termination because "She's in a protected category. So why don't you let this wait and do this later . . . once you get more documentation in place." (Ex. A, McMullen Depo., pp. 224:20-225:6).

In her deposition, McMullen admitted under oath that the decision to terminate Boleware was discussed the week before she gave McMullen her

[21] McMullen admits that her complaint and charge should have stated "workplace harassment," not "sexual harassment," with regard to Boleware's complaint. (Ex. A, McMullen Depo., p. 441:4-442:20).

December 2, 2013 complaint. (Ex. A, McMullen Depo., p. 217:7-14).[22] McMullen also admitted that the termination letter was finalized the morning of December 2, 2013, prior to receipt of the internal complaint. (Ex. A, McMullen Depo., p. 219:20-23, 223:8-19). McMullen also advised the Equal Employment Opportunity Commission (EEOC) that no retaliation was involved in the decision to terminate Boleware, and that the decision was made before Boleware submitted her complaint. (Ex. A, McMullen Depo., p. 220:5-12; Ex. P, Boleware Position Statement).

It is undisputed that President Jenkins' first knowledge of Boleware's complaint resulted from a December 4, 2013 email from McMullen. (Ex. R, December 4, 2013 email; Ex. B, Jenkins Depo., p. 90:16-19).[23] McMullen sent this e-mail two days after Boleware was fired. (Ex. R, Email dated December 4, 2013) Clearly, President Jenkins did not fire Boleware in retaliation for making a complaint. The same day, Vice President Bhuiyan sent McMullen an email stating that he was concerned about the confidentiality of his discussion with McMullen

---

[22] McMullen now contends that she was no present for the meeting in which the termination decision was made, just that she was made aware of the meeting and decision. (Ex. A, McMullen Depo., p. 217:7-21). Webb recalls that McMullen acknowledged to her being a part of the termination decision meeting that preceded Thanksgiving break. (Ex. Z, Webb Depo., pp. 27:23-28:17, 92:13-20). Webb also recalls that the meeting took place on November 26, 2013. (Ex. Z, Webb Depo, p. 92:17-24).

[23] Dr. Jenkins has no recollection of McMullen opposing the termination of Boleware because it might appear to be retaliation. (Ex. B, Jenkins Depo., p. 44: 18-21). McMullen does not recall discussing the Boleware termination with Dr. Jenkins before Boleware was terminated. (Ex. A, McMullen Depo., pp. 250:23-251:4).

and University Counsel regarding employees in his department. (Ex. R, December 4, 2013 email). Vice President Bhuiyan complained that "every single time" he had such a discussion with McMullen, the content got back to the employee at issue. (*Id.*). McMullen responded by disputing the allegations, copying the President, and blind copying her personal email account, and stating that it was purely coincidental that Boleware filed a complaint on the same day Vice President Bhuiyan had already decided to terminate her. (*Id.*). Once he received notice of Boleware's complaint, President Jenkins ensured that it was investigated by hiring an independent consultant to perform the investigation. (Ex. A, McMullen Depo., p. 244:15-20; Ex. Z, Webb Depo., pp.13:24-14:4; Ex. B, Jenkins Depo., p. 39:20-24).[24]

On December 19, 2013, McMullen met with President Jenkins, Ms. Webb, University Counsel, and Dr. Bhuiyan to discuss Boleware. (Ex. A, McMullen Depo., pp. 246:16-21, 269:9-11; Ex. Z, Webb Depo., p. 286:29-24). During that meeting, McMullen contends that Vice President Bhuiyan criticized her for failing to tell him that terminating Boleware might appear retaliatory. (Ex. A, McMullen Depo., p. 277:19-278:2, 470:15-19). In response, McMullen says she stated, "I

[24] Webb contracted with Tuskegee from December 6, 2013 to June 30, 2014. (Ex. Z, Webb Depo., pp. 13:24-14:4). Webb was originally brought on December 6, 2013, to conduct independent investigations of internal complaints. (Ex. Z, Webb Depo., p. 16:18-21). The first complaint was Boleware. (Ex. Z, Webb Depo., p. 16:24-17:1). Judkins and Woodard were part of subsequent complaint investigations that Webb conducted. (Ex. Z, Webb Depo., p. 17:22-18:4).

specifically told you that that's protected category. It's going to give the appearance of retaliation." (Ex. A, McMullen Depo., p. 275:1-5). According to McMullen, providing her opinion that terminating Boleware might appear retaliatory was part of her job. (Ex. A, McMullen Depo., p. 298:5-10). McMullen testified that it was "my responsibility to tell him that I thought that would appear retaliatory." (Ex. A, McMullen Depo., p. 298:11-20). She also stated:

> At Tuskegee University, if I was privy to a termination and if I thought that the documentation did not support the termination or more information was needed or if I thought that an employee had presented a document that put them in what I considered a protected class, then, yes, I felt that it was my obligation to share that information with that VP and communicate that in the presence of legal.

(Ex., A McMullen Depo., p. 300:18-301:4). Webb recalls that the December 19, 2013 meeting was tense, because there was concern over whether McMullen had influenced Boleware to file her complaint and delayed her delivery of Boleware's termination letter to allow time for Boleware to deliver the complaint. (Ex. Z, Webb Depo., p. 37:1-8). McMullen denied this. (Ex. Z, Webb Depo., p. 38:6-11).

**2) Fred Judkins – January 15, 2014.**

On January 9, 2014, Fred Judkins sent McMullen an email requesting leave because he was sick. (Ex. T, Email dated January 9, 2014). McMullen sent him FLMA paperwork and conditionally approved him for FMLA leave pending his return of medical documentation. (Ex. A, McMullen Depo., p. 149:12-17; Ex. U,

Email dated January 11, 2014). To McMullen's knowledge, he was never actually approved for FMLA leave. (McMullen Depo., p. 149:18-21, 312:6-17, 313:10-13).

Judkins was terminated on January 15, 2014, for threatening to kill the President. (Ex. A, McMullen Depo., p. 317:3-12; Ex. V, Email dated January 15, 2014). McMullen was not a part of the decision to terminate Judkins. (Ex. A, McMullen Depo., p. 472:1-21). Prior to her termination, according to McMullen, University Counsel asked her whether, if "somebody was on FMLA, would that be a protected category." (Ex. A, McMullen Depo., p. 310:3-8). McMullen responded, "yes." (Ex. A, McMullen Depo., p. 310:8). However, when asked under oath, McMullen testified that if an employee requested leave, but had not been approved, they would not be legally protected from termination -- it would just "look bad" to terminate them. (Ex. A, McMullen Depo., p. 316:13-20). Following McMullen's termination, she learned that Judkins had been terminated and began to think that the two must be related "because I couldn't get a reason as to why I was termed . . . So the only thing I could think of that could have taken place that would be these situations that I had been asked about and I had given my professional opinion and I thought they were in protected categories." (Ex. A, McMullen Depo., p. 310:9-20). McMullen admits she has no idea why Judkins was terminated. (Ex. A, McMullen Depo., p. 476:3-9, 481:4-482:14).

**3) Kimberly Woodard – January 31, 2014.**

President Jenkins terminated Kimberly Woodard (Director of Alumni Affairs) on January 31, 2014, ten days after McMullen's termination. (Ex. B, Jenkins Depo., p. 51:13-24). McMullen did not participate in the termination process for Woodard. (Ex. A, McMullen Depo., p. 506:8-12). President Jenkins does not remember McMullen expressing an opinion on whether to terminate Kimberly Woodard. (Ex. B, Jenkins Depo., p. 51:22-24). McMullen contends that Woodard's name briefly came up during the December 2, 2013 meeting between University Counsel, McMullen, and Vice President Bhuiyan. (Ex. A, McMullen Depo., p. 225:16-23). At that time, Vice President Bhuiyan discussed possibly terminating both Woodard and Boleware at the same time and McMullen claims she advised Dr. Bhuiyan "no don't do any of that, you know, leave that alone right now. You don't have enough documentation, especially Ms. Boleware. She just presented this complaint. It would appear to be retaliatory. Please don't do that. You know, I advised against it." (Ex. A, McMullen Depo., p. 225:16-226:10).

**D. Tuskegee's Staff Handbook designates employees as at-will.**

The Tuskegee Staff Handbook states on its first page, "[t]his Staff Handbook describes only the highlights of Tuskegee University policy and employee benefits and is **not to be interpreted as a legal document or employment contract**." (Ex. C, Staff Handbook, Bates # 0045) (emphasis added). The Handbook receipt that

McMullen signed reads in pertinent part, "I acknowledge that this handbook is neither a contract of employment nor a legal document." (Ex. W, Handbook Receipt). McMullen testified that she did not consider the Handbook a legal document and that it was not to be interpreted as a legal document. (Ex. A, McMullen Depo., p. 51:11-16, 88:12-16).[25] The Handbook goes on to list guidelines for disciplinary action and explicitly states that the list "does not change the employment-at-will relationship between the employee and Tuskegee University." Ex. C, Staff Handbook, Bate Stamp #0045). With regard to this provision, McMullen testified that it was the University's position that her employment was "at-will" and that "under the provisions of the staff handbook" in place at the time of employment, employees were "at-will." (Ex. A, McMullen Depo., p. 54:19-58:10).

McMullen concedes that she was not under a written contract with the University. (Ex. A, McMullen Depo., p. 59:19-23). However, she does not "feel" that she had an at-will employment relationship with the University because when she was interviewed, she was asked whether could make a long-term commitment to working and told that she might like working at Tuskegee so much that she would decide to stay a long time. (Ex. A, McMullen Depo., pp. p. 59:4-14; 73:15-

[25] McMullen also testified that her employment with her current employer, the Salvation Army, was also at-will and that the language in the Salvation Army's Employee Manual did not create a contract between McMullen and the Salvation Army. (Ex. A, McMullen Depo., p. 44:6-11; Ex. X, Employee Manual Receipt and Acknowledgement).

74:13).

McMullen now claims that she believed that she would be at the University for an "extended period of time." (Ex. A, McMullen Depo., p. 68:10-21). That was not based on a written contract and was not set out in any writing. (Ex. A, McMullen Depo., p. 69:1-7). Rather, during her interview, she was asked by the interview panel[26] how long she thought she could commit to being at the University. (Ex. A, McMullen Depo., p. 69:8-19). McMullen thinks she responded by stating she could commit to seven years, although she had never held any prior job for that length of time. (Ex. A, McMullen Depo., p. 73:15-74:13). McMullen recalls that one of the panelists stated she might end up enjoying the job and want to stay longer. (Ex. A, McMullen Depo., p. 82:20-83:4).

McMullen cannot recall anyone from the University stating that she would have a job at Tuskegee for seven years. (Ex. A, McMullen Depo., p. 84:6-14). There was no specific period of time bargained for or set out in the offer letter and related correspondence with McMullen and the University. (Ex. Y, Email dated January 26, 2014).

## III. LEGAL ARGUMENT

### A. Summary judgment standard.

A motion for summary judgment provides the court an opportunity to assess

[26] McMullen recalled that the following employees served on her interview panel: Dr. Luther Williams (Provost), Dr. Leland Burge (Dean of the College of Engineering), Dr. Ruby Perry (Dean of the College of Veterinary Medicine), Tamara Lee (Government Relations), and Cecil Lucy (CFO). (Ex. A, McMullen Depo., p. 70:19-72:21).

all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The substantive law governing the plaintiff's claims determines which facts are material and which are relevant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). "Tenuous insinuation" and empty speculation based on loose construction of the evidence will not satisfy the non-movant's burden. *Holiness v. Moore-Handley, Inc.*, 114 F. Supp. 2d 1176, 1180 (N.D. Ala. 1999).

**B. McMullen's Title VII retaliation claims fail as a matter of law.**

McMullen contends that she was terminated from her employment in retaliation for "complaining about discriminatory practices." (Doc. 1, ¶ 1). Specifically, McMullen alleges she opposed the termination of three University employees: Tracy Boleware, Fred Judkins, and Kimberly Woodard. However, as set forth more fully below, McMullen cannot establish a *prima facie* case of Title VII retaliation with regard to any of these claims, nor can she refute Tuskegee's legitimate, non-retaliatory reason for termination. Accordingly, her retaliation claims are due to be dismissed.

**1) McMullen cannot establish a *prima facie* case of retaliation.**

Title VII prohibits retaliation by an employer because an employee has opposed an unlawful employment practice made unlawful under Title VII or made

a charge of discrimination. 42 U.S.C. § 2000e–3(a). To establish a *prima facie* case, McMullen must show that (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) the protected activity was the but-for cause of the adverse employment action. *Van Der Meulen v. Brinker Int'l*, 153 F. App'x 649, 654 (11th Cir. 2005); *Booth v. Pasco Cnty., Fla.*, 757 F.3d 1198, 1207 (11th Cir. 2014) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013) ("Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action.")). For purposes of summary judgment only, Tuskegee assumes that the employment decision identified by McMullen's Complaint – her discharge – constitutes an adverse action. However, McMullen cannot establish that she engaged in protected activity or that her discharge was causally related to protected activity.

**a. McMullen did not engage in protected activity.**

To support her retaliation claim, McMullen asserts that she engaged in protected activity under Title VII by advising the University to postpone or refrain from terminating the employment of Tracy Boleware, Fred Judkins, and Kimberly Woodard. None of these actions constituted protected activity sufficient to support a claim of Title VII retaliation.

**i. Under the manager's rule, McMullen did not engage in protected activity.**

McMullen alleges that she was terminated in retaliation for advising the

University that it should delay terminating Boleware because it might give the "perception of retaliation" due to Boleware having delivered an internal complaint the on the day set for her termination. (Ex. A, McMullen Depo. pp. 222:5-223:2, 260:17-21). McMullen states that she advised Boleware's supervisor to delay the termination until he had more documentation lined up to support the action. (Ex. A, McMullen Depo., p. 224:20-225:6). McMullen does not dispute that the decision to terminate Boleware was made prior to December 2, 2013 (the date of termination). (Ex. A, McMullen Depo., p. 217:7-14, 219:20-23, 223:8-12). McMullen does not contend that Boleware's termination was in fact retaliation, just that it might give the appearance. (Ex. A, McMullen Depo., p. 275:5-10). She told the EEOC that is was not retaliation. (Ex. P, Boleware Position Statement to EEOC, p. 1). Her opposition was not to *actual* retaliation or any conduct that is unlawful under Title VII, but to the *appearance* of retaliation. (Ex. A, McMullen Depo., p. 275:5-10). In the University's response to Boleware's EEOC charge, McMullen advised the EEOC that Boleware's termination was not retaliation and that the termination decision had been made the week prior to December 2, 2012. (Ex. A, McMullen Depo., p. 220:5-12; Ex. H, email dated January 3, 2014; Ex. P, p. 1). She made a similar statement to Vice President Bhuiyan and President Jenkins. (Ex. S, p. 1).

Further, McMullen states that it was part of her job as HR Director to advise

University personnel that proceeding with the termination after receiving the internal complaint might appear to be retaliatory. (Ex. A, McMullen Depo., p. 298:5-10). McMullen says “that was my role,” and that she had an obligation and a duty to advise the University on that issue. (Ex. A, McMullen Depo. p. 298:11-20). The “manager rule” holds that when a management employee, in the course of her normal job performance, disagrees with or opposes an employer’s actions, she does not engage in protected activity. *Brush v. Sears Holdings Corp.*, 466 Fed. Appx. 781, 786 (11th Cir. 2012). Rather, in order for such opposition to qualify as protected activity, the management employee’s actions must “cross the line” from an employee performing her job to an employing lodging a personal complaint. *Brush*, 466 Fed. Appx. at 787 (holding that the manager rule excludes management officials whose opposition to alleged discrimination falls within the scope of their duties from Title VII retaliation protection); *see also*, *Fletcher v. Supreme Bev. Co.*, No. 2:11-cv-00056-MHH, 2014 WL 5518294, *17 (N.D. Ala. Oct. 31, 2014) (applying *Brush*’s reasoning and holding that under the Manager’s Rule the plaintiff’s relay of internal employee complaints of discrimination to upper management did not constitute protected activity because “he did not lodge a personal complaint about racial discrimination.”); *Dunn v. Wal-Mart Stores East, L.P.*, 2013 WL 1455326 (S.D. Fla. April 9, 2013) (“Thus, under Defendant's policies, Plaintiff was obligated to report the complaints to Labor Relations.

Consequently, despite Plaintiff's testimony, Plaintiff did not step "outside of her assigned responsibility," or cross the line from performing her job to lodging a personal complaint, when she went over the store level management to report the claims of discrimination to Labor Relations."). As the Fifth Circuit aptly explained in *Hagan v. Echostar Satellite, LLC***:**

> If we did not require an employee to "step outside the role" or otherwise make clear to the employer that the employee was taking a position adverse to the employer, nearly every activity in the normal course of a manager's job would potentially be protected activity. . . . An otherwise typical at-will employment relationship could quickly degrade into a litigation minefield, with whole groups of employees – management employees, human resources employees, and legal employees, to name a few – being difficult to discharge without fear of a lawsuit. For those reasons, we agree that an employee must do something outside of his or her job role in order to signal to the employer that he or she is engaging [in] protected activity . . .

529 F.3d 617, 628 (5th Cir. 2008).[27]

The Tenth Circuit analyzed a similar claim in *McKenzie v. Renberg's Inc.*,

---

[27] Other courts invoking and applying the "step outside the role" rule include *Pettit v. Steppingstone, Center for the Potentially Gifted*, 429 Fed. Appx. 524, 530 n.2 (6th Cir. 2011) ("To the degree that Pettit's FLSA complaints were made in the course of performance of human resource job duties assigned to her and undertaken for the purpose of protecting the interests of the employer, they do not constitute protected activity under § 215(a)(3)."); *Samons v. Cardington Yutaka Techs*., Civ. A. No. 08-988, 2009 WL 961168 at *7 (S.D. Ohio Apr. 7, 2009) (finding that plaintiff did not step outside her role as human resources manager where she alerted the company about alleged FLSA violations as part of her job duties and did not complain about these alleged violations on behalf of herself or other women employees from a standpoint adversarial to the company); *Cook v. CTC Comm'ns Corp.*, Civ. A. No. 06-58, 2007 WL 3284337, at *6 (D. N.H. Oct. 30, 2007) (holding that in order to show protected activity, the plaintiff had to establish that she acted outside of her role as a human resources manager when she advocated on behalf of an employee's USERRA rights); *Hill v. Belk Stores Svcs., Inc.*, Civ. A. No. 06-398, 2007 WL 2997556, at *1 (W.D.N.C. Oct. 12, 2007) ("actions within the scope of an employee's duties are not protected for purpose of Title VII.").

where a personnel director asserted that she was retaliated against for advising her employer that it was at risk of claims that might be instituted by other employers as a result of FLSA violations. 94 F.3d 1478, 1486-87 (10th Cir. 1996). The Court noted that the plaintiff-employee:

> never crossed the line from being an employee merely performing her job as personnel director to an employee lodging a personal complaint about the wage and hour practices of her employer and *asserting* a right adverse to the company. . . . Rather, in her capacity as personnel manager, she informed the company that it was at risk of claims that might be instituted by others as a result of its alleged FLSA violations.

*McKenzie*, 94 F.3d at 1486; *see also*, *Cyrus v. Hyundai Motor Mfg. Ala., LLC*, No. 2:07-cv-144, 2008 WL 1848796, at *13 (M.D. Ala. Apr. 24, 2008) (relying on *McKenzie* to conclude that "[because in reporting misconduct to Duckworth in August 2005 Plaintiff was merely doing his job, not engaging in protected conduct, Plaintiff cannot establish a *prima facie* case."). The court went on to explain that in order to engage in protected activity, the employee must "step outside" her "role of representing the company and either file (or threaten to file) an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA." *Id.* at 1487. The Court found that the plaintiff did not step outside her role of representing the company where the evidence showed that her job duties included participating in wage and hours issues and that there was no evidence the plaintiff was asserting any personal

rights or taking any action adverse to the company. *Id*. It was "completely consistent" with the plaintiff's "duties as personnel director for the company to evaluate wage and hour issues and to assist the company in complying with its obligations under the FLSA." *Id*. As such the court of appeals affirmed summary judgment in favor of the employer. *Id*.

Like *McKenzie*, McMullen provided opinions and recommendations regarding personnel decisions, including termination decisions and possible associated risks, as a regular part of her job duties with Tuskegee. (Ex. A, McMullen Depo., p. 298:45-10, 300:18-301:4). McMullen states that she did not "step outside her normal role" or "cross the line," lodge a personal complaint, or assert a right adverse to Tuskegee when she advised Legal Counsel that an employee who was approved for FMLA would be in a protected category or when she advised Dr. Bhuiyan that she thought terminating Boleware might appear retaliatory. (Ex. A, McMullen Depo., p. 298:5-10). McMullen also states that her actions were in no way personal. (Ex. A, McMullen Depo., p. 298:5-20). Moreover, the terminations at issue were not in fact unlawful or retaliatory. Because it is uncontroverted that McMullen never stepped outside of her role as HR Director when communicating with University personnel and advising the University about the terminations at issue, she did not engage in protected activity and all of her retaliation claims are due to be dismissed.

**ii. McMullen's professional opinion regarding an employee on FMLA leave is not protected activity under Title VII.**

To qualify as "protected activity" under Title VII, opposition must be to a "practice made unlawful by [Title VII]." 42 U.S.C. § 2000e-3(a). McMullen advising University Counsel that an employee on FMLA would be in a protected category is not opposition to a practice made unlawful under Title VII. Title VII does not provide protection for leave under the FMLA. McMullen's professional opinion regarding an employee on FMLA leave is not opposition to an unlawful employment practice under Title VII. Accordingly, McMullen's retaliation claim as it relates to Judkins, is due to be dismissed.

**iii. McMullen did not engage in protected activity with regard to Woodard's termination and McMullen's claim related to Woodward exceeds the scope of her EEOC charge.**

There is no evidence to support the allegation that McMullen opposed Woodard's termination, nor was this claim addressed in McMullen's charge of discrimination. (Ex. A, McMullen Depo., p. 281:1-22; Ex. O, McMullen EEOC charge). McMullen was terminated on January 21, 2014, ten days before Woodard. (Ex. B, Jenkins Depo., 51:25-52:2). McMullen was not involved in the decision to terminate Woodard, nor is there evidence that McMullen opposed a practice made unlawful by Title VII as it relates to Woodard. (Ex. A, McMullen Depo., p. 506:8-12). Any advice given to the University about possibly terminating Woodard

would have been given in the course of her job as HR Director and would not constitute protected activity.

In addition, McMullen's EEOC charge, references Judkins and Boleware, but not Woodard. (Ex. O, McMullen EEOC charge). It is well settled that in any employment case brought under Title VII, a court must first determine the "permissible scope of a judicial complaint," which requires the court to initially review the plaintiff's EEOC charge. *Crayton v. Alabama Dept. of Agric. & Indus.*, 589 F. Supp. 2d 1266, 1280 (M.D. Ala. 2008). Ultimately, an employee's lawsuit is "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of a charge of discrimination." *Robinson v. Regions Fin. Corp.*, 242 F. Supp. 2d 1070, 1079 (M.D. Ala. 2003). A claim may be reasonably expected to grow out of an EEOC charge if the claim is "like or related to, or grew out of, the allegations contained in [the] EEOC charge." *Gregory*, 355 F.3d at 1280. When considering the extent of a reasonable investigation by the EEOC, courts must look to the face of the "EEOC charge itself, with a particular focus on the factual statement contained therein." *Freeman v. Koch Foods of Ala.*, 777 F. Supp. 2d 1264, 1277 (M.D. Ala. 2011).

McMullen's charge makes no reference to Woodard or opposition to Woodard's termination. (McMullen Depo., p. 281:1-282:4, 506:19-21). As such, this claim asserts exceeds the scope of the EEOC charge and resulting

investigation. Eleventh Circuit courts have routinely dismissed claims in Title VII retaliation cases where the claims exceed the scope of a prior EEOC charge. *See Thomas v. Miami Dade Pub. Health Trust*, 369 Fed. App'x, 22-23 (11th Cir. 2010) (holding that the plaintiff was barred from alleging retaliatory acts not mentioned in her EEOC Charge, even where she had checked the retaliation box and listed two specific retaliatory acts); *Matthews v. City of Mobile*, No. 12-00353-KD-N, 2013 WL 5883833, at *6 (S.D. Ala. Oct. 31, 2013) (dismissing one of the plaintiff's retaliation claims because the plaintiff did not allege the alleged protected activity as a basis for her retaliation claim in her Complaint or EEOC Charge); *Swindle v. Hale*, No. 2:09-cv-1458-SLB, 2012 WL 4725579, at *21 (N.D. Ala. Sept. 30, 2012) (holding that the plaintiff failed to exhaust administrative remedies where she attempted to assert new acts of retaliation that were not in her EEOC Charge).

Because the claim falls outside of the EEOC Charge, McMullen had no part in Woodard's termination, and McMullen did not oppose any unlawful conduct under Title VII, this portion of the retaliation claim is due to be dismissed.

**b. McMullen cannot establish but-for causation.**

Even if McMullen engaged in protected activity, her retaliation claim still fails because she cannot establish but-for causation. In *University of Texas Southwestern Med. Ctr. v. Nassar*, the Supreme Court held that Title VII retaliation

claims "require proof that the desire to retaliate was the but-for cause of the challenged employment action." 133 S.Ct. 2517, 2520-21 (2013). Thus, McMullen must prove that her protected activity was **<u>the reason</u>** that Tuskegee terminated her employment – not just a motivating factor. *Id.* The only evidence McMullen offers of causation is her own speculation and conjecture. (Ex. A, McMullen Depo. pp. 260:12-14, 277:3-15, 278:10-15, 290:12-291:6). McMullen admits she never discussed the Boleware or Judkins terminations with President Jenkins before their terminations (Ex. A, McMullen Depo., pp. 246:13-247:2). There is also no evidence that President Jenkins was aware of McMullen's statement to University Counsel about an employee who was on FMLA leave being in a "protected category" status. McMullen admits that she did not discuss that information with President Jenkins prior to her own termination. (Ex. A, McMullen Depo., pp. 250:18-251:5).

To the extent that McMullen may point to the temporal proximity between her termination, her communication with Vice President Bhuiyan about terminating Boleware and general communications with Vice President Bhuiyan, University Counsel and Judkins himself as evidence of causation, Tuskegee contends that such evidence standing alone is not sufficient to support a claim of retaliation. In *Montgomery v. Bd. of Trustees of the University of Alabama*, the court held that but-for causation applies to both the prima facie and pretext stages

of a plaintiff's case (not just to the pretext analysis). No. 2:12–CV–2148–WMA, 2015 WL 1893471, at *4 (N.D. Ala. April 27, 2015); *see also Donald v. UAB Hosp. Mgt.*, No. 2:14-cv-727, 2015 WL 3952307, at *4 (N.D. Ala. June 29, 2015). The court explained that a plaintiff cannot demonstrate a prima facie case of retaliation by relying solely on temporal proximity: "[m]erely by showing that she was terminated shortly after she complained does not meet the prima facie standard for proof that she was terminated only because she complained." *Montgomery*, 2015 WL 1893471, at *4. **Close temporal proximity** constitutes evidence of causation, but, **standing alone**, it **is no longer sufficient to establish but-for causation**:

> In the instant case, the interval between Montgomery's alleged protected activity and her final discharge was a **mere fourteen days.** This fact forms Montgomery's only evidence of causation in her prima facie case. Under the pre-*Nassar* standard, such a short period would be found to establish causation for a prima facie case of retaliation. While this level of proof was enough when a plaintiff needed to show only that the protected activity was **one** of several potential motivating factors, this court is of the opinion that temporal proximity alone does not meet the new "but for" causation standard.

Indeed, as the Eleventh Circuit opined in another context:

> The *post hoc ergo propter hoc* fallacy assumes causality from temporal sequence. It literally means "after this, because of this." It is called a fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship.

> Under *Nassar*, as this court understands the Supreme Court, Montgomery must establish that her protected activity was the "but-for" cause of her discharge. This is true both ultimately and at the

> prima facie stage. **Merely showing that she was terminated shortly after she complained does not meet the prima facie standard for proof that she was terminated only because she complained**. Therefore, because Montgomery has failed to establish a prima facie case for retaliation under *Nassar*, summary judgment is appropriate.

*Montgomery*, 2015 WL 1893471 at *4 (final emphasis added) (internal citations omitted).

Here, McMullen has offered no evidence of causation, much less *but-for* causation. Merely asserting that she was terminated six weeks after she advised Vice President Bhuiyan regarding Boleware and a week or two after she advised Counsel on an unidentified employee who she has since decided must have been Judkins, does not meet the *prima facie* standard for proof that she was terminated only because she allegedly engaged in protected activity.

Moreover, President Jenkins did not have knowledge of any actions McMullen describes herself as taking with regard to Judkins or Woodard. Without such knowledge there can be no causal connection. *See Brown v. City of Opelika*, 211 Fed. Appx. 862, 863-64 (11th Cir. 2006) (stating that to establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct). McMullen offers nothing more than her own speculation and conjecture to support her allegation that her termination was motivated by retaliatory animus. As such, McMullen cannot establish "*but–for*" causation and her retaliation claims are due to be dismissed.

### 2) McMullen cannot refute Tuskegee's legitimate, non-retaliatory reason for her discharge.

If an employer provides a legitimate, nondiscriminatory reason for taking an adverse employment action,[28] the burden shifts back to the employee to establish that the employer's explanation was pretextual. McMullen cannot establish pretext by merely quarreling with the wisdom of President Jenkins for her discharge. *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000). Rather if a stated reason "is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it." *Chapman*, 229 F.3d at 1024.[29] The pretext analysis is "concerned with the employer's perception of the employee's performance, not the employee's own beliefs." *Snowden v. City of Daphne*, 283 Fed. Appx. 693, 695 (11th Cir. 2008). Thus, McMullen must prove **both** that the reasons provided are false **and** that President Jenkins more likely acted with a retaliatory motive. *Snowden*, 283 Fed. Appx. at 695 (citing *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

---

[28] An employer satisfies its burden of production by offering an honest, good faith belief in the reason for an employee's dismissal, even if that good-faith belief is found to be mistaken. *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176-77 (11th Cir. 2000); *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999); *Rojas v. Fla.*, 285 F.3d 1339, 1342 (11th Cir. 2002) ("We are not interested in whether the conclusion is a correct one, but whether it is an honest one.").

[29] *See also, Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (the plaintiff's subjective belief that she has been discriminated against, without more is not enough to establish prima face case of race discrimination).

Tuskegee has established that McMullen was discharged because President Jenkins firmly believed she disclosed confidential personnel services-related information and that she continued to disclose confidential information, in violation of University policy despite having signed confidentiality agreements, institutional policy, and his verbal warnings. (Ex. B, Jenkins Depo., p. 52:11-23). This is a legitimate, non-retaliatory reason for discharge, and McMullen cannot prove that reason is pretextual. *See Butler v. Advance/Newhouse Partnership*, No. 6:11-cv-1958-Orl-28GJK, 2013 WL 1233002, *6-7 (M.D. Fla. Mar. 26, 2013) (holding that an employer's belief that the plaintiff breached confidentiality and/or used poor judgment in making a disclosure of information to another employee within the company was a legitimate, non-retaliatory reason for termination and dismissing plaintiff's retaliation claim). When a proffered reason for an employment decision is based on violation of a work rule, a plaintiff may establish pretext by showing that other employees outside her protected class engaged in similar acts and were treated favorably. *Lopez v. AT&T, Corp.*, 457 F. App'x 872, 875 (11th Cir. 2012). McMullen is unable to offer any evidence that comparators received favorable treatment.

McMullen's "conclusory allegations [and] unsupported assertions of" retaliation are insufficient to establish pretext. *Gillard v. Ga. DOC*, 500 F. App'x 860, 864 (11th Cir. 2012) (citation omitted). Accordingly, her retaliation claims are

due to be dismissed.

### C. McMullen's claim for breach of implied contract fails as a matter of law because her employment was at-will.

In her Complaint, McMullen contends the University's Staff Handbook creates an implied contract[30] entitling her to the opportunity to answer the misconduct allegations made by President Jenkins and appeal her termination decision. (Doc. 1, ¶¶ 34, 35). The Handbook states that it is not an employment contract or legal document of any kind. (Ex. C, Bates # 0045; Ex. A, McMullen Depo., p. 54:3-10). The Handbook goes on to explain that regular employees may be terminated in accordance with Section 18.5 (that pertains to discipline and discharge). (Ex. C, Tuskegee University Staff Handbook, p. 22) Section 18.4 provides regular staff members the opportunity to answer charges of misconduct in writing and have that answer reviewed by the Director of Human Resources. (Ex. C, Staff Handbook, pp. 21-22). Section 19 sets out a grievance procedure allowing regular staff members five days to appeal adverse decisions. (Ex. C, Staff Handbook, pp. 22-23). The University's Guidelines for disciplinary action (found at the end of the relevant Handbook) states that employment is at-will. (Ex. C, Staff Handbook, p. E; Ex. A, McMullen Depo., p. 54:3-10).

---

[30] A contract implied in fact requires the same elements as an express contract, and differs only in "the method of expressing mutual assent." *Berry v. Druid City Hospital Bd.*, 333 So. 2d 796, 799 (Ala. 1976).

"The bedrock principle of Alabama employment law is that, in the absence of a contract providing otherwise, employment in this state is at-will, terminable at the will of either party. Under this doctrine, an employee may be discharged for any reason, good or bad, or even for no reason at all." *Johnson v. City of Marion*, 743 So. 2d 481, 483 (Ala. Civ. App. 1999) (quoting *Ex Parte Amoco Fabrics & Fiber Co.* , 729 So. 2d 336, 339 (Ala. 1998)). However, in *Hoffman–La Roche, Inc. v. Campbell*, the Alabama Supreme Court held that "the language contained in a handbook can be sufficient to constitute an offer to create a unilateral binding contract" if three requirements are satisfied. 512 So. 2d 725, 735 (Ala. 1987). First, the language contained in the handbook must be examined to see if it is specific enough to constitute an offer. *Hoffman-La Roche, Inc*., at 735. Second, the offer must have been communicated to the employee by issuance of the handbook, or otherwise. *Id*. Third, the employee must have accepted the offer by becoming employed after he has become generally aware of the offer. *Id*. Her actual performance supplies the necessary consideration. *Id*. A unilateral contract will arise where the language in the handbook is clear and mandatory (rather than merely a general statement of policy), provided that the clear language is not rendered ambiguous by inconsistent or contradictory provisions. *Id*. at 734. However, **an explicit disclaimer by the employer in the handbook or manual will override any other language and maintain the employee-at-will status**. *Id.*;

*Hanson v. New Technology, Inc.*, 594 So. 2d 96, 99 (Ala. 1992); *McCluskey v. Unicare Health Facility, Inc*., 484 So. 2d 398, 400 (Ala. 1986).

In *Wyant v. Burlington Northern Santa Fe. R.R.*, 210 F. Supp. 1263, 1294 (N.D. Ala. 2002), the district court applied the same analysis and held that "[t]he language in the employment policy and the handbook do not constitute an offer of employment" because "the language in these writings expressly disclaims that a contract of employment is in any way created." *Wyant*, 210 F. Supp. at 1294. The Court reasoned that the employer "chose to state clearly and expressly in its handbook that the policies and procedures contained in the handbooks are not '*intended to be contractual and do not constitute, nor are they part of, any contract of employment or any other kind of contract.... Employment at BN is at will.*'" *Id.* (emphasis in original). The employee policy states that employment "*can be terminated, with or without cause, and with or without notice, at any time, at the option of either the Company or the employee.*" *Id.* (emphasis in original). Based "on the express disclaimers contained in the employment policy and the handbook stating that employment was 'at will,'" the court granted summary judgment, holding "that neither the personnel policies nor procedure manuals could reasonably be construed to constitute an enforceable contract of employment." *Id.*

Applying the precedent set forth in *Hoffman-La Roche*, the Staff Handbook at issue here does not constitute an implied contract, because it contains multiple

disclaimers, along with additional disclaimers in the Handbook Receipt. Tuskegee chose to state clearly and expressly in the Handbook that the policies contained therein did not create a contract and was not to be construed as a legal document. (Ex. C, Staff Handbook; Bates # 0045, p. E). In addition, the Handbook and Receipt make clear that Tuskegee intended employment to be at-will. (Ex. C, Staff Handbook, p. E; Ex. W, Handbook Receipt). In addition, McMullen never utilized the grievance procedure to appeal her termination decision, as provided in Section 19 of the Handbook. (Ex. C, Staff Handbook, pp. 22-23). As such, her breach of implied contract for employment claim fails and is due to be dismissed.

## IV. CONCLUSION

McMullen's allegation that her discharge was unlawfully motivated by retaliatory animus is wholly unsupported. The undisputed facts are clear that McMullen was merely carrying out her job duties as HR Director at the time she advised the University with regard to the Boleware and Judkins terminations. McMullen did not cross the line from performing her job to lodging a personal complaint in opposition to the University. Therefore, she did not engage in protected activity under Title VII. Moreover, McMullen cannot establish that such opposition was the "*but– for*" cause of her termination, nor can she demonstrate evidence of pretext sufficient to refute President Jenkins' legitimate, non-retaliatory reason for termination. McMullen's breach of implied contract claim

also fails because she was an at-will employee and the Staff Handbook at issue clearly stated that it was not intended to create a contract, be interpreted as a legal document, or alter the at-will-employment relationship. McMullen never appealed or filed a grievance following her termination. There exist no genuine issues of material fact and Tuskegee respectfully requests entitled to summary judgment on all of McMullen's claims and dismissal of this action in its entirety.

For the foregoing reasons, Tuskegee respectfully requests that this Court grant its Motion for Summary Judgment, dismiss this case with prejudice, and award Tuskegee its costs and attorney's fees in defending against this case.

Respectfully submitted,

*s/Katherine E. Reeves*

Lisa Karen Atkins
Katherine E. Reeves
OGLETREE DEAKINS NASH
SMOAK & STEWART, P.C.
420 North 20th Street, Suite 1900
Birmingham, Alabama 35203
Telephone: (205) 328-1900
Facsimile: (205) 328-6000
lisa.atkins@ogletreedeakins.com
katie.reeves@ogletreedeakins.com

Attorneys for Defendant
Tuskegee University

## CERTIFICATE OF SERVICE

I do hereby certify that on February 26, 2016, I have electronically filed the foregoing by using the CM/ECF system which will send notification of such filing to the following:


Heather Newsome Leonard
HEATHER LEONARD, PC
PO Box 43768
Birmingham, AL 35243
Phone: 205.977.5421
Fax: 205.278.1400
Email: heather@heatherleonardpc.com


*s/Katherine E. Reeves*
OF COUNSEL